GARY M. RESTAINO
United States Attorney
District of Arizona
JOSEPH F. BOZDECH
California State Bar No. 303453
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Joseph.Bozdech@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>           Plaintiff,<br><br>v.<br><br>$17,000.00 in United States Currency,<br><br>           Defendant *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

## NATURE OF THE ACTION

1.      This is a civil action *in rem*, brought to enforce the provision of 21 U.S.C. § 881(a)(6) for the forfeiture of property which represents money or other things of value furnished or intended to be furnished by a person in exchange for a controlled substance, proceeds traceable to such an exchange, and money used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.

2.      This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. § 981(2)(1)(A) and (C) for the forfeiture of United States currency which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, including but not limited to dealing in a controlled substance and 18 U.S.C. § 1952, travel in

interstate commerce with the intent to distribute proceeds of unlawful activity as defined in 18 U.S.C. §§ 1952, 1956(c)(7) and 1961.

3.      Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j), and 28 U.S.C. §§ 1355(b) and 1395, as acts and omissions occurring in the District of Arizona give rise to this forfeiture action.  This Court has jurisdiction by virtue of 28 U.S.C. §§ 1345 and 1355, and 18 U.S.C. § 981(h).

**THE DEFENDANT IN REM**

4.      The defendant $17,000.00 in United States currency (the "defendant property"), was seized on January 10, 2022, at Phoenix Sky Harbor International Airport. The defendant property is currently in the custody of the United States Marshals Service.

**INTRODUCTION**

5.      The following information describes an investigation conducted by members of the United States Drug Enforcement Administration (DEA) Phoenix Financial Investigation Group's Commercial Narcotic Interdiction Unit (FIG/CNIU). The FIG/CNIU is made up of Phoenix Police Department (PPD) Commercial Narcotic Interdiction Unit detectives deputized as DEA Task Force Officers, DEA Special Agent Kenneth Theriault (SA Theriault), and Homeland Security Investigations Special Agent Rhonda Cantrell (collectively, "investigators").

6.      FIG/CNIU is located at Phoenix Sky Harbor International Airport. FIG/CNIU investigators conduct financial investigations pursuant to seizures made by members of the FIG/CNIU. The primary responsibility of the FIG/CNIU is to investigate crimes involving the use of commercial airlines and shipping companies to transport illegal drugs and proceeds.

7.      Based on investigators' training and experience, cities in the Eastern, Midwest, and Southern United States, including Florida, are considered demand locations for illicit drugs. Oregon is a known drug distribution state for illicit drugs, primarily marijuana.

8.      Based on training and experience, investigators are aware that persons involved in the trafficking and distribution of illicit drugs utilize passengers on commercial airlines to transport the proceeds from the sale of illicit drugs due to the convenience and expediency of airline travel. This method of travel allows for last minute travel arrangements, often within 48 hours of departure, and the ability to travel long distances in short periods of time. The use of couriers aboard commercial airlines and parcels shipped or mailed by commercial shipping companies provide lower risk of detection by law enforcement as well as lower operating costs. It is also common for these illicit drug and money couriers to travel on short notice due to the uncertain and volatile nature of the illicit drug trafficking and distribution business. Persons travelling to source cities from demand cities with U.S. currency to be used to purchase illicit drugs often contend with several logistical issues before the drug transaction is complete, which often necessitate last-minute changes to itineraries.

9.      Based on training, experience, and information obtained from law enforcement throughout the country, investigators are aware that proceeds from the sale of illicit drugs are transported from demand locations to source locations. Once the proceeds from the sale of illicit drugs reach source cities the proceeds will be used to purchase more illicit drugs. The illicit drugs will then be shipped or carried by couriers to the demand locations for sale and distribution. Illicit drug trafficking organizations and illicit drug business entrepreneurs find this lucrative because the illicit drugs are purchased in source locations for relatively low cost and sold in demand locations for a significantly higher price creating higher profit margins. In their effort to identify and disrupt potential drug and money couriers related to drug organizations and criminal syndicates, investigators utilize a variety of resources, including confidential informants, monitoring suspicious flight itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence.

10.     Based on investigators' training and experience, some of the factors that constitute suspicious flight itineraries include airfare purchases at the counter

immediately prior to departure or short notice reservations for a one-way travel, sometimes paid in cash. Couriers travel with minimal or no luggage and will often attempt to board the aircraft at the last possible moment. Drug and money couriers utilize these techniques to conceal their identities from law enforcement authorities and minimize their exposure to commercial airlines.

## FACTUAL BACKGROUND

11. On January 10, 2022, FIG/CNIU investigators received ticket information listing the flight itinerary for passenger Alvaro Valencia (Valencia) travelling aboard American Airlines flight #1402 from Tampa, Florida to Phoenix, Arizona. Valencia had a ticket to depart the following day to Medford, Oregon on American Airlines flight #5915.

12. The ticket information indicated that a third-party purchased the tickets within 48 hours of departure.

13. A criminal history query of Valencia revealed no criminal record, but connected Valencia to the following:

    a. A check of DEA indices revealed that in a Tucson DEA case in January 2020, Valencia was recorded over the telephone speaking to another drug target regarding the purchase of multiple kilogram quantities of cocaine;

    b. A query in the El Paso Intelligence Center (EPIC) for a jetway tip dated December 20, 2020;

    c. Information provided by the Bureau of Alcohol, Tobacco, Firearms, & Explosives (ATF) listed Valencia as the possessor of several firearms that were recovered on June 30, 2021; and

    d. Post contact currency transaction reports (CTR) involving suspected structuring and suspicious activity.

### Consensual Contact and Interview with Valencia

14. After the flight, investigators observed Valencia exit the jetway. DEA Task Force Officer Tony Schiaveto (TFO Schiaveto) contacted Valencia. TFO Schiaveto

introduced himself, showed his law enforcement credentials, and asked Valencia if he could speak with him. Valencia agreed and stopped walking.

15.    TFO Schiaveto asked Valencia if he recently purchased his ticket. Valencia replied "no" but that he was unsure because his wife purchased the ticket for him.

16.    In response to TFO Schiaveto's question, Valencia stated he was travelling to Oregon.

17.    Valencia denied living in Oregon and stated that he lived in Seattle.

18.    However, when asked his purpose for travelling to Oregon, Valencia stated he had another home in Oregon and lived there.

19.    TFO Schiaveto asked Valencia if he was travelling with any large amounts of marijuana or currency. Valencia stated he was not travelling with marijuana but was travelling with approximately $10,000 in his carry-on bag.

20.    Valencia consented to a search of his carry-on bag to verify the amount of currency he claimed to have in his possession.

21.    During the search, investigators located several stacks of currency wrapped in generic bank bands.

22.    When the amount of currency appeared to be more than $10,000, TFO Schiaveto asked Valencia if he knew the total amount of the currency. Valencia was unsure.

23.    TFO Schiaveto counted $16,000 in the stacks of currency in Valencia's possession.

24.    Valencia agreed to accompany investigators to the FIG/CNIU office located in Terminal 4 to count the exact amount of currency in his possession and speak with investigators about the origin and purpose of the money.

**Narcotics Canine Alert to the Defendant Property**

25.    Prior to the count of the currency, a narcotics canine, Moxie, was deployed to sniff the currency. Moxie alerted to the presence of one of the three illicit drug odors she is trained to detect (methamphetamine, heroine, and cocaine). Moxie is a two-year-

old black lab/border collie mix, whose only handler is TFO Elizabeth Poole (TFO Poole). Moxie started service training in October 2021 and was first certified with the National Police Canine Association (NPCA) on January 6, 2022. Moxie also certified with the National Narcotic Detector Dog Association (NNDDA) on June 21, 2022. If at any time during a search Moxie smells one of the three odors she is trained to detect, she will present an active/passive alert at the area she smells the odor in or on.

26.     TFO Poole examined the main FIG/CNIU office area for hazards and none were observed. The office space consists of multiple cubical spaces, desks, filing cabinets, and other office eqipment. TFO Poole retrieved Moxie from her kennel, brought her into the main office, and commanded Moxie to search and sniff the area. This process ensures that a canine does not alert on a pre-existing odor. TFO Poole observed no alerts during the clearing of the area or items therein. Moxie was then re-kenneled.

27.     TFO Travis Myers placed a loose amount of the defendant property inside an empty filing cabinet drawer in the FIG/CNIU office. Approximately fifteen minutes later, TFO Poole brought Moxie back into the office and gave a command to search and sniff the area. When Moxie sniffed over the drawer containing the currency, TFO Poole observed Moxie's breathing increase and her behavior change. Moxie began to source the odor. Moxie then gave her trained alert by sitting and barking at the drawer containing the currency. TFO Poole recognized this behavior as a positive alert indicating that Moxie could smell one of the three odors she is trained to detect. Moxie was commanded to continue to search and sniff the office and other items. Moxie did not alert to any other scent.

28.     The alert of a trained narcotics detection canine to currency suggests that the money is drug related.

**Count of Defendant Property**

29.     The total count of currency located in Valencia's carry-on bag was $17,000.

6

30.     The currency in Valencia's possession consisted of 550 twenty-dollar bills ($11,000), a denomination that is commonly associated with street level drug sales. The rest of the currency consisted of 54 fifty-dollar bills and 33 hundred-dollar bills.

31.     A large amount of currency, with a vast majority of the bills in the twenty-dollar denomination, suggests that the money is drug-related.

### Source of the Currency in Valencia's Possession

32.     Valencia told investigators the money came from a bank in Oregon. Valencia stated he was travelling to Tampa with the money to buy a vehicle. However, when the vehicle purchase fell through, Valencia stated he viewed a potential vacation home to purchase.

33.     Valencia explained that he travelled to Tampa with approximately $35,000 but claimed he deposited funds into his Bank of America account because he did not want to return with that amount on hand.

34.     Valencia told investigators that he had been in Tampa since January 5, 2022. Valencia reiterated that he travelled to Tampa to purchase a vehicle and potentially purchase a vacation home.

35.     Valencia did not provide any make, model, or year details of the vehicle he wanted to purchase. Valencia claimed he contacted a seller over the phone but was unable to provide documents or text messages to verify the potential purchase, or the name of the seller.

36.     Valencia stated that he had a friend in Tampa who put him in contact with an associate selling their home but did not provide any information or photographs of the potential home, or the name of the associate.

37.     TFO Schiaveto asked Valencia how he obtained the money he was travelling with. Valencia stated that he had two businesses, "The Mustang Shop" and "Professional Floor Finish," as his primary sources of income. Valencia was unable to provide business cards for the businesses, but said they were registered in the state of Washington.

38.     Valencia stated that "The Mustang Shop" business closed as of January 1, 2022 and was being relocated and renamed to "TMS Performance." According to the State of Washington Secretary of State website, the business license for "The Mustang Shop" expired on April 4, 2022 and has a "delinquent" business status as of September 20, 2022. No record or information for "TMS Performance" was found on the State of Washington Secretary of State website.

39.     Valencia also stated "Professional Floor Finish" was registered in the state of Washington, but investigators found no record or information for the business on the State of Washington Secretary of State website.

40.     TFO Schiaveto asked Valencia where he obtained the bank bands wrapped around the bundles of currency. Valencia stated they came from his business.

41.     Valencia claimed "Professional Floor Finish" had a nationwide contract with AutoZone to clean the floors for 158 stores in Seattle, 52 stores in Idaho, and 78 stores in Oregon. Valencia further claimed that AutoZone paid for this service in cash.

42.     Valencia stated that his annual income from "Professional Floor Finish" was approximately $100 to $140 thousand dollars and his annual income from "The Mustang Shop" was approximately $60 to $70 thousand dollars.

43.     When asked about the last time he filed taxes for the businesses, Valencia told investigators that his wife handled the accounting records and information.

44.     Valencia affirmed that the currency in his bag belonged to him. Valencia explained he recently sold a truck and was going to flip it by buying another vehicle.

45.     TFO Schiaveto asked Valencia to clarify if the currency in his possession came from the sale of the truck or the bank in Oregon as previously mentioned. Valencia stated that it came from both sources.

46.     Valencia explained that he sold a 2017 Ford F-250 truck for $52,000 and had the bill of sale from Texas. Valencia stated he never drove the vehicle, but only owned it for a year before selling it to a buyer in Oregon. However, Valencia could not provide information for the previous seller or the new purchaser of the vehicle.

47.   Based on training and experience, investigators know drug traffickers and money couriers often lack an ability to produce a consistent, logical explanation regarding the purpose of travel and the reason for transporting large quantities of currency. Further, numerous bundles of generic-banded currency are not indicative of legitimate business transactions.

48.   TFO Schiaveto asked Valencia why he was in possession of two cellphones. Valencia explained that there is poor cellphone service at his home in Oregon, so the phones had different providers.

49.   Based on training and experience, investigators know that those involved in the illicit drug trade often have multiple phones in order to isolate the phone they use for drug transactions from their personal phone, helping them avoid detection.

50.   Valencia consented to a search of his cellphones. TFO Schiaveto found several photographs of large quantities of marijuana and marijuana plants, what appeared to be a marijuana grow and marijuana extract, a list of marijuana strands, what appeared to be a drug ledger with names and monetary amounts, and text messages of marijuana distribution.

51.   When TFO Schiaveto stepped out of the interview room, Valencia made a phone call and conversed in Spanish. This call was later translated by TFO Poole, a PPD certified Spanish speaker. Valencia told the unknown caller, who investigators believe was Valencia's wife, that he was stopped by DEA and told DEA that he sold a truck and was buying a car. There was also an unintelligible exchange about marijuana.

52.   Based on training and experience, investigators believe that the U.S. currency found in Valencia's possession was not legitimately earned and is likely to be proceeds from illicit drug sales or was intended to be used to purchase illicit drugs.

**Financial Investigation**

53.   On September 26, 2022, SA Theriault made a request to Criminal Intelligence Analyst Darin Templeton (IA Templeton) at the High Intensity Drug

Trafficking Area (HIDTA) Investigative Support Center to obtain information from the State of Washington regarding Valencia's wages.

54.     IA Templeton requested information from Washington State Fusion Center and was unable to find employment wages for Valencia.

55.     Wells Fargo Bank records from 2020 show that Valencia is a 20% owner of The Mustang Shop LLC dba TMS Performance and Dyno Tuning in Kent, Washington. The bank activity from Valencia's Wells Fargo account until January 2021 included various deposits from The Mustang Shop ranging from small amounts up to $7,025 as if the deposits were payments per job. However, the records did not indicate recurring deposit amounts like a paycheck.

56.     From August 21, 2020 to December 4, 2020 a total of $267,712.78 was deposited into Valencia's Wells Fargo Bank account from ATMs and Coinbase.com, a platform of cryptocurrency exchange. Analysts were unable to verify if the Coinbase.com funds were payment for automotive work.

57.     In 2021, Valencia appeared to have employment from a car restoration business where large cash deposits could be payments for automotive work.

58.     Based on training and experience, IA Templeton could not make a connection between these large cash deposits and automotive work.

59.     Valencia is listed as the owner and contractor of the business Professional Floor Finish. Bank Secrecy Act Currency Transaction Reports (BCTR) filed by Bank of America revealed that from July 30, 2020 to January 10, 2022, $46,640 was deposited into an account owned by Valencia and associated with Professional Floor Finish. An additional $8,404 was transferred from Professional Floor Finish to Valencia's Wells Fargo bank account, but no report was filed for suspicious activity. After IA Templeton's initial financial report, there was an additional BCTR filed on May 15, 2022 for a cash deposit of $12,000 into Valencia's Bank of America account.

60.     A BCTR filed by Alaska USA Federal Credit Union revealed that from May 20, 2021 to June 10, 2021 a total of $50,000 was deposited into Valencia's personal account and $25,000 was withdrawn by Valencia.

61.     BCTRs filed by JP Morgan Chase Bank revealed that from December 6, 2019 to February 4, 2021, Valencia deposited $28,000 into his personal account. This amount was deposited in $5,000 and $6,000 increments.

62.     Based on investigators' training and experience, potential structuring activity includes multiple cash deposits and withdrawals on the same date which, if combined, would have met or exceeded the BCTR reporting threshold of $10,000, as well as deposits near $10,000 but less than the threshold. Drug traffickers often structure their deposits and withdrawals to avoid having to fill out a CTR.

**Administrative Claim**

63.     On July 25, 2022, DEA received a claim to the $17,000.00 from Alvaro Valencia.

64.     As supporting documentation for his claim, Alvaro Valencia provided a four-page copy of the Bill of Sale of a 2017 Ford F-250 VIN: 1FT7W2B64HEF01238 for $70,000 sold to David Robison on January 2, 2022, a one-page copy of the DEA-12 Receipt for Cash, and a copy of the DEA letter to counsel dated August 3, 2022.

**Historical Information for the 2017 Ford F-250**

65.     As supporting documentation of the Administrative Claim, Valencia included the Bill of Sale for a 2017 Ford F-250 (the "F-250"), VIN: 1FT7W2B64HEF01238. The Bill of Sale indicated that Valencia sold the F-250 to David Robison in Grants Pass, Oregon for $70,000 on January 2, 2022.

66.     A historical search of the VIN indicated that the vehicle is a 2017 Ford F-250 Crew pickup with a base price of $38,930. The original title holders were Jose V. Galvez and Victor Manuel Galvez.

67. According to the National Law Enforcement Telecommunication System (NLETS), the last person to hold the title to the F-250 was Carlos Rameses Lizarraga (Lizarraga). The title was transferred to Lizarraga on August 24, 2018.

68. According to the State of Oregon Department of Transportation, when selling, donating, or gifting a vehicle, the seller is required to notify the Department of Motor Vehicles (DMV) within ten days of the sale. The DMV will record that the vehicle was sold, but the seller remains listed as the owner until the buyer transfers the title.

69. There is no record of a title transfer to Valencia or David Robison, nor has the F-250 been registered anywhere else since the sale to David Robison.

70. Although the F-250 was not registered in his name, Valencia claimed it belonged to him.

71. Based on training, experience, and information obtained from and information obtained from law enforcement throughout the country, investigators are aware that it is a common practice for drug traffickers to claim assets that are not under their name belong to them to explain or justify the reason for travelling with large sums of U.S. currency. Drug traffickers often place their assets in others' names, such as family members, or do not register the assets at all, to conceal or protect the assets from law enforcement. Concealing assets in others' names or not registering the asset at all, makes it more challenging to prove a direct link between the asset and the criminal.

72. A search into the DEA database for the initial title holders of the F-250 referenced Houston DEA case #M3-17-0253. The case identifies Lizarraga as a cocaine supplier and the head of a drug trafficking organization involved in the distribution of methamphetamine, cocaine, and heroine in the Houston, Texas area.

73. Additionally, Victor Manuel Galvez is listed as an associate of Lizarraga's, who assisted in the distribution of methamphetamine, cocaine, and marijuana.

74. The F-250 Valencia claims to have sold was reported to be used by Lizarraga in the Houston DEA investigation. On June 8, 2018, surveillance showed that

Lizarraga used the F-250 when he attempted to convince a Houston Police Department confidential source to wire $48,463.43 for him.

75.    SA Theriault made multiple attempts to contact David Robison to verify the validity of the Bill of Sale provided by Valencia. David Robison's business partner claimed he was in the hospital and would get a message to him to contact SA Theriault.

76.    To date, no contact between SA Theriault and David Robison has been made.

## FIRST CLAIM FOR RELIEF

Based on the aforementioned facts and circumstances, the defendant property was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*., or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*., and therefore subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

## SECOND CLAIM FOR RELIEF

The defendant property constitutes or is derived from proceeds traceable to some form of specified unlawful activity, conducted and attempted to conduct a financial transaction, i.e., the movement of proceeds of trafficking in controlled substances in violation of 18 U.S.C. § 1952, and therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that process issue for an arrest warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and

disbursements of this action.

Respectfully submitted this 18th day of November, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*S/ Joseph F. Bozdech*
JOSEPH F. BOZDECH
Assistant United States Attorney